fact and conclusions of law separately stated was to clearly indicate to the court the basis of fact upon which the conclusion of law followed and required the decree or judgment to be rendered, and to permit the parties to take clear and definite exceptions for purposes of review. While not strictly complying in form, the report precisely states the facts and the rulings thereon in all matters at issue between the parties. Neither the parties nor the surrogate were left groping in the dark. The questions were sharply raised by the exceptions and squarely decided. Under those circumstances, it would seem to be an idle ceremony, after the decree, after appeal therefrom, and after the printing of a voluminous record, upon the eve of argument to send back a report to the referee to make clear what is not obscure, to permit exceptions to be taken which have already been taken, to raise questions which have already been decided. No proposed findings were submitted to the referee which he refused or failed to pass upon, and whatever rights the appellant may have had were waived by not objecting to the report in season, but in taking her exceptions thereto, arguing them before the surrogate, and appealing from his decree. We think that the practice requires referees in Surrogate's Courts to conform to the provision for separately stating and numbering findings of fact and conclusions of law; but, upon the record in the case at bar, the order should be affirmed, with $10 costs and disbursements to the respondent.

O'BRIEN, P. J., and INGRAHAM, McLAUGHLIN, and HOUGHTON, JJ., concur.

In re SCHROEDER.

(Supreme Court, Appellate Division, First Department. May 18, 1906.)

1. ADMINISTRATORS—SETTLEMENT—CHARGES AND CREDITS — RENT OF LEASED PREMISES.
    Where the term of a lease was unexpired when the lessee died, and his widow, as administratrix, made all reasonable and proper efforts to sublet the premises, occupying them in the meantime, she was not, as administratrix, chargeable with the rent during the time of her occupancy.

2. GIFTS—EVIDENCE.
    One who attempts to establish title by gift inter vivos must do so by clear and conclusive evidence.
    [Ed. Note.—For cases in point, see vol. 24, Cent. Dig. Gifts, §§ 95, 99.]

3. SAME—SUFFICIENCY OF PROOF.
    In an accounting by a widow as administratrix of her deceased husband, evidence *held* insufficient to show that deceased had given certain personal property to the administratrix.

4. ADMINISTRATORS—ACCOUNTING—CHARGES AND CREDITS—PAYMENT OF ACCOUNTS—CLOTHING AND MOURNING GARMENTS.
    In an accounting by a widow as administratrix of her deceased husband, money expended by the administratrix in paying a current account for articles of clothing, part of which were furnished before her husband's death and part of which consisted of mourning garments, was properly allowed as a credit.

5. SAME—FUNERAL EXPENSES—FLOWERS.
    The administratrix was not entitled to credit for sums expended for flowers to place upon the grave of deceased.
    [Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 436, 755.]

**6. SAME—HOUSEHOLD EXPENSES.**

Sums paid for electric lighting for the house in which the administratrix lived after her husband's death, and for coal used in the house more than 60 days thereafter, were properly disallowed as credits, under Code Civ. Proc. § 2713, giving the wife the right to household supplies for a period of 60 days only.

**7. SAME—GOODS ORDERED BEFORE DEATH.**

She was, however, properly allowed credit for groceries and other household necessities ordered before the death of her husband.

**8. SAME—ANTENUPTIAL DEBTS OF WIFE.**

She was not entitled to credit for a sum paid in settlement of an account for jewelry which she ordered before she was married, and which it did not appear the husband had ever promised to pay.

**9. SAME—DISTRIBUTION OF ASSETS—CORPORATE STOCK.**

Where, on an accounting by an administratrix, it appeared that the estate held a controlling interest in the stock of a corporation, and it was agreed by the parties that it was not advisable to sell the stock, it was proper to order a distribution thereof whereby the management of the corporation passed into the hands of the guardian and relatives of an infant daughter of the intestate; there being no showing that these persons were not capable of managing the corporation.

**10. SAME—CASH BALANCE.**

In an accounting by an administratrix, the court should provide for the payment of commissions, expenses, and all necessary future disbursements, and so should not order a balance of cash to be distributed until the final winding up of the estate.

**11. SAME—REFERENCE—ACCOUNT—RE-REFERENCE.**

In an accounting by an administratrix, it is proper for the court to send the case back to a referee for further findings.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, § 2191.]

**12. SAME—MONEY RECEIVED BY ADMINISTRATOR BY VIRTUE OF OFFICE.**

An intestate held a majority of the stock in a corporation; the balance of the stock being held by one individual. Prior to intestate's death, these parties had agreed that, in case of the death of either, the survivor should have the option to buy out the interest of the decedent's estate, and that, if he failed to exercise this option within 20 days, the corporation should be dissolved. At the time of the death of intestate, the corporation was much involved, and an immediate settlement of its affairs would have been disastrous. The attorney for the widow, who was administratrix, suggested to the surviving stockholder that it was necessary for the administratrix to obtain money for her immediate personal needs, and thereafter the surviving stockholder made weekly payments of from $50 to $100 to the administratrix, and on an accounting by her he testified that these payments were voluntary gifts. *Held* that, as the payments were made to induce the widow to refrain from exercising her power as holder of the stock, as she occupied a fiduciary relation with respect to the estate, she was liable to account to it for the payments.

Ingraham and Houghton, JJ., dissenting in part.

Appeal from Surrogate's Court.

Judicial settlement of the account of Lora C. Schroeder, as administratrix of the estate of Edwin A. Schroeder, deceased. From a decree overruling in part the report of a referee, the administratrix appeals. Modified and affirmed.

Argued before O'BRIEN, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

Charles M. Demond and Walter S. Logan, for appellant.
Henry De F. Baldwin and Lord, Day & Lord, for respondent.

CLARKE, J. This is an appeal by the administratrix from a decree of the Surrogate's Court overruling in part the report of a referee, upon an accounting made by Lora C. Schroeder, as administratrix of Edwin A. Schroeder, deceased. Edwin A. Schroeder died October 14, 1902, leaving his widow, Lora C. Schroeder, who was appointed administratrix. Prior to his marriage to Lora C. Schroeder, he had been divorced from his former wife, Carrie B. Schroeder, and had one child by the former marriage, an infant, Phillis L. Schroeder. Her mother, Carrie B. Schroeder, had been appointed guardian of this infant. In April, 1904, Carrie B. Schroeder, as such guardian, applied for a compulsory accounting, and an order for an accounting was made. The administratrix then petitioned for a voluntary accounting, and after due service filed her account, which is the subject of this appeal. The account was referred by the surrogate under the provisions of section 2546, Code Civ. Proc., to a referee to examine said account and objections, and to hear and determine all questions arising upon the settlement of said account which the surrogate has power to determine. The referee afterwards filed his report, and exceptions thereto were taken and argued by both parties before the surrogate, who overruled the report of the referee in some particulars and sustained it in others.

Considering the points raised upon this appeal:

1. It seems that at the time of his death Edwin A. Schroeder was living with the appellant in a rented house at No. 10 Lexington avenue. After the decedent's death his widow continued to live in this house for about seven months. Respondent objected to the account before the referee, upon the ground that the administratrix failed to charge herself with the rent of this house for this period. The referee found that the appellant did not assume the lease by continuing to remain in the house after her husband's death; that therefore she could not be charged with rent thereof; that she could not be charged for use and occupation of the premises because the evidence was that the said use and occupation was of no value. The learned surrogate reversed this determination of the referee and held that the appellant was chargeable with the reasonable value of the use and occupation of the premises; that said use and occupation was of considerable value, and fixed the same at the rental value specified in the lease, viz., $1,408.29. The appellant had already paid the rent for the time which she remained in the house after her husband's death and had charged this against the estate in her account, and the same had been allowed by the referee. The evidence upon which the referee based his finding was the testimony of appellant and that of her attorney, Walter S. Logan. Appellant testified that she put the house in the hands of two or three real estate agents and tried to rent it, but was unable to do so, for the reason that the furnace which heated it was defective. That she tried to rent it furnished for $4,000 per annum, because that was the amount that her husband had thought it ought to bring. That she also tried to let it unfurnished, as did also the owner of the house, but to no avail. That she did not want to remain in the house and would have left at once if she could have obtained a tenant. That she received an offer

to rent the house, if she would put in a different furnace. Mr. Logan testified that he attempted to surrender the lease or relet the premises, but that it could not be done; that Mrs. Schroeder desired to leave because it was too expensive to remain; and that she merely stayed there so as to help relet the premises if possible. It seems to me that this evidence was sufficient to justify the referee's finding that the appellant should not be charged with rent for the premises for the time she remained in them after her husband's death. The estate being chargeable with the unexpired lease, she was justified in remaining in the house to be on hand to show it to prospective tenants and try to rent it if possible. The evidence shows that she used reasonable efforts to rent the house, and there is no evidence to the contrary. From all that appears $4,000 was not an unreasonable rental to ask for the house furnished, and there is evidence that she tried to rent it for a less amount unfurnished. By remaining in the house she was not subjecting the estate to any additional burden. The rent would have had to have been paid just the same if she had moved out. It cannot be said that, had she moved out, the house could have been rented to some one else, for the evidence is all to the effect that it could not have been so rented.

2. The administratrix claims that the furniture and silverware which was left by her husband in the house at 10 Lexington avenue was given to her by him during his lifetime. Both the referee and the surrogate held that there was not sufficient evidence to support this claim and charged the administratrix with the value of said furniture and silverware. To establish the gift to the administratrix, Mr. Logan testified that shortly after the marriage Mr. Schroeder called upon him at his office and told him that he had given his wife all the furniture and "stuff" in the house at 10 Lexington avenue. Mrs. Bailey, an aunt of the administratrix, testified that she heard the deceased tell the administratrix that he had given her everything in the house as a wedding present. She also testified that he allowed his wife to arrange everything in the house as she liked. Mrs. Okie, the mother of the first husband of the administratrix, which husband the administratrix had divorced, testified that in the course of a conversation with Edwin A. Schroeder, in which the furniture, tapestry, decorations, etc., were discussed by him, he remarked that "he was glad that Lora [the administratrix] could appreciate all these beautiful things which he had given her." Mary E. Wilson, a nurse employed by the administratrix, testified that she heard Mr. Schroeder remark several times that he had given his wife everything in the house as a wedding present. Mrs. Knapp, a sister of the administratrix, testified that she had a conversation with Edwin A. Schroeder after his marriage to the administratrix, in which he "referred to his marriage as being very happy, and that my sister ought to be happy, as he had given her all these things contained in the house at 10 Lexington avenue, in the city of New York, including the furniture, bric-a-brac, silverware, and dishes, in fact, everything contained in the house, and had made her a wedding present of all these things."

On behalf of the contestant, William A. Stafford, the brother-in-law of the deceased, testified that after the death of Edwin A. Schroeder

he saw the administratrix at her home, and "she said, 'How is this es-
tate going to be divided?' and I said that, 'As he died intestate, I pre-
sume it will be divided according to law. In your case you will get
one-third and Phillis will get two-thirds.' 'Now,' she said, 'that's
pretty hard on account of the furniture in this house. There are cer-
tain articles which I had expressed a great desire to have, and which
I know he intended I should have, and, if it becomes necessary to sell
the contents of the house, I probably would not get the articles to
which I have become attached.' * * * I said that, 'unless he made
you a deed of gift bequeathing these to you, you are not entitled to
anything but the proceeds which will accrue from a sale of the con-
tents of the building.'" The administratrix denies that the conversa-
tion was as related by Stafford. She testified:

"I had several conversations with Mr. W. A. H. Stafford shortly after Mr.
Schroeder's death. I did not ask him what would become of the furniture
in the house. No such conversation took place in which he said that it would
have to be sold, and I replied, 'That seems terrible; some of these things I
know Ned intended me to have.' May I be allowed to state the conversation?
Nothing of that sort took place, nothing like that at all. It was something
like that, but not that. I know it absolutely."

She failed, however, to state what this conversation was. Her only
other testimony on this point was:

"I had so many conversations with Mr. Stafford. He called on me a great
many times. I know I had a conversation with him, and he wanted me to
put my interests in the hands of Mr. Weiss, the lawyer, and they were all
very much excited because I did not do that, and I have had conversations
with him about my affairs, but never about the furniture of the house. He
suggested those things many times to me; but I simply did not feel that there
was any reason why I should discuss these things with him, and I never did.
He is very antagonistic, and it is very likely he said these things. Yes, very
likely he made that statement, or that he might make any statement at all.
He is very antagonistic."

The administratrix also testified that, before her husband died, she
gave certain of the things away that she did not want; and that she
sent some of the things away to be sold and received the proceeds
therefrom and spent the same. But upon cross-examination she was
unable to state what things she sent away to be sold, where she sent
them or how much she received from the sale of them. It seems to me
that this evidence is not sufficient to establish a valid gift inter vivos
to the administratrix. All of the witnesses who testified in her behalf,
with the possible exception of Mrs. Okie, the mother of her first hus-
band, were interested witnesses. One was her attorney who represented
her in this case, another her aunt, a third a maid who was in her em-
ploy at the time she testified, and a fourth her own sister. Appellant
contends that Mrs. Okie cannot be considered an interested witness,
since appellant had divorced her son. If it had not been for that fact
Mrs. Okie would have fallen within that category, and the fact that
Mrs. Okie had seen fit to visit the appellant and her second husband in
their home would tend to show that she had not lost that interest.

The law is well established in this state that one who attempts to
establish title through a gift inter vivos must do so by clear and con-
clusive evidence. As was said in Matter of O'Connell, 33 App. Div.
483, 53 N. Y. Supp. 748:

"He who attempts to establish title through a gift inter vivos, as against the estate of a decedent, takes upon himself a heavy burden which he must support by evidence of great probative force, which clearly establishes every element of a valid gift, viz., that the decedent intended to divest himself of the title in favor of the donee and accompanied his intent by a delivery of the subject-matter of the gift."

The language of Judge Vann, in the case of Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916, is applicable here. He says:

"Thus the evidence relied upon to establish the contract is: First, the testimony of the mother who tried to swear $100,000 into the pocket of her own child; and, second, the testimony of the witnesses who swear to the admissions of the dead man. The former is dangerous; the latter is weak, and neither should be acted upon without great caution. We have repeatedly held that such a contract must not only be certain and definite and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence."

The evidence offered to establish the gift intended was not of that clear and uncontradicted nature which the law requires. The referee, who had an opportunity to observe the demeanor of the witnesses, came to the same conclusion, and, aside from there being no reason why his determination should be set aside, there is every reason why it should be upheld. It is true, as contended by the appellant, that, in view of the fact that she and the decedent were living together as husband and wife, it would have been unusual that this property should have been removed into the exclusive possession of the appellant, and for that reason an entire change of possession would not be a necessary part of the proof of delivery; but, aside from that question, I do not think that the intention to make the gift has been sufficiently established. The surrogate was right in charging the appellant with the furniture, silverware, and other effects in the house at No. 10 Lexington avenue, except as to such articles as are comprised within the exceptions set forth in section 2713 of the Code of Civil Procedure.

3. Appellant contends that the surrogate erred in holding that the charge of the attorney of $3,000 for legal services should be cut down to $2,000, and that the remaining $1,000 paid should be charged against the administratrix. It seems that, while the attorney retained the sum of $3,000 collected from the corporation of Schroeder & Arguimbau as payment for legal services rendered by him to the estate, it appears that he afterwards gave $1,000 of this amount to the administratrix. The attorney claims that this transaction was a personal loan by him to the administratrix. I do not think the discretion of the surrogate in fixing the proper amount of the attorney's fees for the services rendered should be disturbed, and he is therefore sustained.

4. Appellant contends that the surrogate erred in holding that the sum of $1,172.40, which was expended for legal services and disbursements in defending and appealing a suit brought against the administratrix for rent under a lease of an apartment formerly occupied by her which had not expired when she moved out and went to live with Mr. Schroeder, was chargeable against her, and not a proper expenditure on behalf of the estate. Appellant bases this contention on her further contention that, at the time he married her,

Mr. Schroeder promised to pay the balance of the rent which should ac-
crue under the lease of her apartment, which she was then leaving,
and, this being so, it was the duty of the estate to defend this action.
The only proof offered to show that the deceased ever promised to pay
this rent was the testimony of the attorney, who defended this suit
and whose bill for these services formed a part of the charge in ques-
tion, to the effect that Schroeder had told him that he had agreed to do
so. This is simply the statement of a third party as to an admission
by decedent, and this party is the one most interested in having this
claim of the appellant upheld. Upon this question of fact the surro-
gate should be sustained.

5. Appellant contends that the surrogate erred in disallowing her
certain small items of expenditure. The items disallowed are set forth
in vouchers 21, 63, 66, 72, 73, and 15, 16, 24, 32, 34, 37, 41, 46, 47, 52,
53, 58.

Voucher 21 was a bill rendered by Hass Bros., with whom the ex-
ecutrix had an account in her husband's lifetime which her husband
permitted her to carry in his name, and which he was in the habit of
paying, for clothing. Most of this was ordered in the husband's life-
time, and what was not consisted of mourning garments for the
widow. This item ($222) should have been allowed.

Voucher 63 was for flowers purchased mostly before the husband's
death, and those purchased afterwards were those which the widow
placed upon the grave immediately after the interment. This latter
item ($22) was properly disallowed; the balance should have been
allowed.

Voucher 66 (48) was a bill for electric lighting in the house at 10
Lexington avenue after the death of Mr. Schroeder. This item was
properly disallowed ($16.85).

Voucher 72 was a bill for coal purchased for the house 10 Lexing-
ton avenue after the husband's death. So much of this as was for
fuel for 60 days was improperly disallowed; and appellant should be
credited with it upon the award made her as widow, under section
2713, Code Civ. Proc.

Voucher 73 was a bill for an ornament ordered at Tiffany's on
July 16, 1901, in the name of Mrs. C. L. Okie, No. 2 West Ninety-
Fourth street, and which remained in their delivery department awaiting
the call of this appellant until January 3, 1903, nearly three months
after the intestate's death, when she directed them to send the bill to
her attorney. This ornament was ordered by the appellant before
her marriage, and there is no evidence to show that the deceased ever
knew of the fact, or that he intended to pay for it. The item was prop-
erly disallowed ($100).

Vouchers 15, 16, 24, 32, 37, 41, 46, 47, 52, 53, and 58 were bills for
groceries and other household necessities, nearly all of which were
ordered before the death of the husband. These should all have been
allowed.

6. The estate held a majority of the common stock of the corpora-
tion of Schroeder & Arguimbau, and this common stock controlled
the election of a majority of the directors of the corporation. The
appellant contends that the surrogate should not have required a dis-

tribution of this stock. It was agreed by all parties that it was not best to sell the stock in this corporation. So that the only question is whether or not the stock should have been distributed, or left in the hands of the administratrix. It appears that by the distribution of this stock the control of the corporation has passed into the hands of the uncles and mother of the infant Phillis Schroeder, who inherited two-thirds of the stock left by her father. These persons are friendly to her interests, and there is nothing to show that they are incapable of properly managing the corporation. It seems to me that, in view of this fact, and also of the fact that the administratrix has used her position to further her own private ends, the surrogate was right in ordering a distribution. I think, however, that the surrogate should have made provision for the payment of commissions, expenses, and all necessary furture disbursements in connection with the estate; and to that end should not have ordered that the balance of cash in the hands of the administratrix be distributed until the final winding up of the estate.

7. Appellant contends that the surrogate erred in sending the case back to the referee to permit further explanation by the administratrix with respect to the furniture in the house at 10 Lexington avenue, and the other articles therein with regard to the value thereof, and to determine the value of said property; also for the purpose of reporting as to the proper allowance to be made the widow under section 2713 of the Code, and as to the amounts which the administratrix had received from Arguimbau by way of weekly allowances. It seems to me that this proceeding on the part of the surrogate was right and proper and entirely within his authority. He had authority to send the account to the referee in the first place, and he certainly has authority to request of him a further and fuller report. The point is not well taken.

8. The remaining question upon this appeal arises upon the contention of the administratrix that the surrogate erred in charging her with certain moneys which she received from one Frank M. Arguimbau. At the time of his death Edwin A. Schroeder held a majority of the common stock which represented a controlling interest in the corporation of Schroeder & Arguimbau Company, of which he was president. At that time the corporation was very much involved. Its paper then outstanding amounted to $295,000. More than $200,000 of the company's assets were invested in Florida lands upon which it was impossible to realize. It owed E. A. Schroeder's estate more than $27,000. Before Schroeder's death he made an agreement with Arguimbau, who owned the next largest interest in the company, and who was the treasurer thereof, that upon the death of either of them an inventory should be immediately taken, and upon the completion thereof the survivor should have the option to buy out the interest of the decedent's estate in the corporation at the inventory value, and that, if such survivor failed to do so within 20 days, the corporation should be dissolved. It seems that Schroeder held 60 per cent. of the common stock in this corporation, and Arguimbau 40, and that by the company's by-laws a majority of the common stock could elect three out of four directors. Schroeder's stock, of course, went to the ad-

ministratrix upon his death, and through it she held the power of control of the corporation.

Shortly after Schroeder died Arguimbau began making payments of $100 a week to the administratrix out of his own pocket. These payments he testified he first made to her as loans, because he "thought it would be to the best advantage of the corporation to do so." After a few weeks, and after consultation with the corporation's attorney and another officer of the corporation, Arguimbau determined to treat these former and all subsequent weekly payments as gifts. He testified:

"The reason why I came to that conclusion to change them from loans to gifts was, well, Mrs. Schroeder had nothing to live on at the time, and I did not want to put Mrs. Schroeder in a position of being obliged to take steps to create any internal trouble in the corporation."

At about the time that this decision was made, the attorney of the administratrix wrote a letter to Arguimbau's attorney in answer to one from him in which he had requested that the administratrix delay taking steps to wind up the corporation, in which, on behalf of the administratrix, he complained of certain increases in salaries which had been voted to Arguimbau and another officer of the corporation since the death of Schroeder, and wound up by saying:

"If she cannot, as administratrix, obtain enough of the money due from the company to Mr. Schroeder to pay the estate's pressing bills—many of which are embarrassing to her personally—and enough money besides on her personal account to enable her to start upon a scale of living within her means, she would naturally feel bound, both for her own protection and the protection of the estate, to settle up the estate's affairs at the earliest possible moment so that she could come into possession of the part that belongs to her in time to serve in some measure her present needs."

After this letter, Arguimbau continued to pay $100 weekly to the administratrix out of his own account, but the treasurer, Stafford, turned over his entire salary received from the corporation to Arguimbau to be used in making part of these payments. This money the latter placed in his private account. Later the salary of Arguimbau as president of the corporation was reduced from $15,000 to $8,600, and thereupon he reduced the amount of the weekly remittances to the administratrix to $50. There can be no doubt but that these payments made by Arguimbau to the administratrix were for the purpose of inducing her to refrain from exercising her right to demand a dissolution of the corporation, and a payment of the corporation's indebtedness to the estate. It is also conceded that to refrain from pressing these matters was greatly to the advantage of the corporation, and it is claimed, consequently, of the estate which owned 60 per cent. of the stock. The question presented, then, is simply whether or not an administratrix shall be charged with moneys which she has received from a source independent of the decedent's estate for refraining from doing an act in her capacity as administratrix which it would have been detrimental to the estate to have done.

The learned referee found that these moneys were voluntary gifts or loans made by Mr. Arguimbau to Mrs. Schroeder, and that they were personal transactions, and were not induced by threats, compulsion, intimidation, or improper solicitation of the administratrix

or any one acting in her behalf, and overruled the objection of the contestants. The learned surrogate reached the conclusion that these sums of money, paid by the officers of the corporation to the administratrix, were "received by her on an express or implied understanding or contract that she would refrain from using the voting power of the stock in that corporation in her hands as administratrix, to their prejudice, and that she would also delay the enforcement of the claim of the estate against the corporation. No part of such moneys was due or payable to her as an individual. She obtained them all because she was administratrix of the estate of her decedent, and because of her control of the assets of such estate. It follows that all of the persons interested in the estate are entitled to share in those sums of money, and that she should be charged with them as assets."

The administratrix occupied a fiduciary relation to the persons interested in the trust estate. The rule in regard to trustees seems clear:

"They cannot use the trust property, nor their relation to it, for their own personal advantage. All the power and influence which the possession of the trust fund gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustees." Perry on Trusts, 427.

In McClure v. Law, 161 N. Y. 78, 55 N. E. 388, 76 Am. St. Rep. 262, in an action to recover from a former president and director of the Life Union a sum claimed as profits made by the defendant out of his trust relationship with the company, an agreement had been made by which the management and control of the corporation had been agreed to be turned over for a stated consideration, accompanied by the resignation from time to time of one or more directors and the election of others in their places. The agreement was carried out, and the defendant received $3,000. The Appellate Division treated the transaction as a bribe, and reached the conclusion that the money did not belong to the corporation. The Court of Appeals said, however:

"As an officer, he had the right to resign, but the money was not paid to him for his resignation. It was paid over upon condition that he procure Levy and his friends to be elected directors and given the control and management together with the property and effects of the corporation. The election of directors and the transfer of the management and property of the corporation were official acts, and whatever money he received from such official acts were monies derived by virtue of his office, for which we think he should account. In Sugden v. Crossland, 3 Sm. & Gif. 192, Horsefield was a trustee under a will. Crossland paid him £75 to withdraw from the trust and have Crossland appointed in his place. It was held that the £75 belonged to the estate."

The court cited the passage from Perry on Trusts, supra, with approval.

I can see no difference in principle between the receipt of money by a director to influence his resignation and the election of another in his place, and the receipt of money by an administratrix to influence and control her actions as administratrix in certain particulars in relation to the estate. It is immaterial whether the action or nonaction was for the benefit of the estate. The money was received because of the relation of the recipient to the estate. It was personal profit made

thereby, and, if the director was accountable in the one instance, the administratrix is in the other.

The rule is clearly stated by Judge Rapallo, in Fulton v. Whitney, 66 N. Y. 555:

"No actual fraud on the part of the defendants is alleged or found, nor is it necessary that it should be. The object of the rule which precludes trustees from dealing for their own benefit in matters to which their trust relates is to prevent secret frauds by removing all inducements to attempt them."

In the case of Carpenter v. Taylor, 164 N. Y. 171, 58 N. E. 53, the plaintiff was a general assignee for the benefit of creditors of the defendant, and made an agreement with the defendant that, in addition to his legal fees and commissions, he should have 15 per cent. on all sums of surplus after payment of the debts of the assignor up to $5,000, and 10 per cent. on anything remaining as surplus. There was a surplus, and he demanded payment in accordance with his agreement. In reversing the Appellate Division, the Court of Appeals said:

"A trustee who holds the title to property for the benefit of others cannot use his position for his personal advantage. He cannot make a profit for himself in the execution of the trust. He cannot ordinarily deal with the beneficiaries or parties interested in the estate so as to acquire the ownership of the trust property."

This administratrix held the title to these shares of stock, and by virtue of such title she received this benefit to herself in the execution of the trust. The general rule is of the greatest importance. Full effect should be given to it by the courts. It is most salutary. Persons holding fiduciary positions, in the many trust relations which modern society has produced, should be held to the strictest accountability. The community should be given to understand that the courts of this state will hold trustees to the highest standard of straight conduct, and will not permit them to make by virtue of their trusts a private and personal profit beyond the compensation allowed by law. In the case at bar, a year and a half went by after decedent's death, and it was not until the contestant began proceedings for a compulsory accounting that the voluntary proceeding was commenced by the administratrix. All this time the two-thirds of the stock of this corporation, which belonged to the infant, was held undistributed in the hands of the administratrix, and she still opposes distribution thereof. Without deciding whether this course has been of advantage to the estate or not, is it not too clear for argument that the fact that she was, through the possession of this stock, receiving these large weekly payments, a temptation to take the course she did? Does it not come squarely within the principle governing the conduct of trustees?

There is no analogy between the case at bar and Matter of Schaefer, 65 App. Div. 378, 73 N. Y. Supp. 57. In that case the executors who were asked to account for salary, and extra compensation received by them from the corporation, were officers of that corporation, and had been so long prior to testator's death, and, as such officers, both before and after said death, had received the payments for their services to the corporation. It was under those circumstances that this court held that the moneys were paid to them as officers of the corporation in-

dividually, in the shape of compensation for services they had rendered to the corporation, and not as property to which the estate was entitled. It seems to me therefore that the learned surrogate properly held the administratrix accountable for these sums.

The decree of the surrogate should therefore be modified as indicated in this opinion, and, as modified, affirmed, with costs to all parties payable out of the estate.

O'BRIEN, P. J., and McLAUGHLIN, J., concur.

INGRAHAM, J.  I concur with Mr. Justice CLARKE in the disposition that he has made of the questions arising upon this appeal, except in relation to the payments made by the administratrix of Frank M. Arguimbau.  As to those payments, I think the estate had nothing to do with them, and that the administratrix should not have been charged with the amount.  Both Mr. Justice CLARKE in his opinion and the surrogate assumed, as I view it, without proof, against the finding made by the referee, that these were payments made to influence the administratrix, acting in her official capacity, by which she obtained a personal benefit, and this case is thus brought within those cited and upon which the conclusion is based.  It is conceded that the course adopted by the administratrix was largely for the benefit of the estate and was the proper course to pursue under the circumstances; and that from the delay in enforcing the claim against the corporation no injury resulted to the estate, but, on the contrary, a distinct advantage. There can be no question but that the administratrix, by adopting the course pursued, assumed a liability for any injury that would result to the estate therefrom.  If the corporation had become insolvent, I assume that the administratrix would have been liable if it had been made to appear that the claim against the corporation could have been collected if proceedings therefor had been promptly instituted.  In considering this particular question, we must remember that this administratrix occupied towards the estate two independent positions.  She was the administratrix, charged with the duty of settling the estate and dividing the personal property among the next of kin.  She was also the widow of the deceased, and, as such, entitled to a distributive share of the estate.  She was totally without means, and was entitled to receive from the estate a portion of her distributive share thereof for her support.  By section 2723 of the Code of Civil Procedure, the surrogate is authorized to entertain a petition at any time after letters are granted for a payment to be made to a person entitled to a distributive share in the estate out of the money or other property in the hands of the administrator applicable to the payment of the distributive share of the petitioner.  The administratrix would not have been justified, if she had collected the personal property of the decedent, in applying the money in her hands on account of her distributive share in the estate; but, having the property in her hands, she would have been entitled to apply to the surrogate, under this section of the Code, for permission to pay to herself the amount of money necessary for her support.  She was thus in a position, not as administratrix, but as entitled to a distributive share of the estate, to apply for the payment

to her of a portion of her share in the estate to be used for her support. To accomplish that purpose it would have been necessary to collect from the corporation the money that it owed to the decedent; but it was only because the widow had the right to have a portion of her distributive share paid to her that such a proceeding against the corporation became imperative. To avoid this necessity, those interested in the corporation considered it to their advantage to provide her from their own means with a sufficient support during the time that the collection of the amount due from the corporation was delayed. There was no question here of influencing the administratrix to do any act that was inimical to the interest of the estate; but, on the contrary, the proof clearly shows that the making of these payments to her by the individuals interested in the corporation created a situation which enabled them to protect not only the interests of the corporation in which they were interested, but also the interests of the estate of which the accounting party was the administratrix. It is, I think, an extension of the principle that an officer of a corporation, or the trustee of an express trust, cannot accept any consideration for influencing his official action, and that any money thus paid is money of the corporation or trust of which he is a representative, to apply it to a case of this kind. Assuming that the widow of the decedent had not been the administratrix, but had insisted upon forcing the administratrix of the estate to collect sufficient money so that she could make an application to the surrogate for a portion of her distributive share, and that, to prevent such an application, the officers of this corporation had voluntarily agreed to contribute out of their own property for her support, those interested in the estate would certainly have no right to claim that money thus paid was the property of the estate. Yet, the only claim made by the administratrix was that, in consequence of her impoverished condition, it was necessary that she should have money to support herself. I think these officers had a perfect right to make this provision for the widow of the deceased, and that the money paid by them for her support pending the settlement of the estate was not money to which the estate was entitled or which should be charged against her.

For these reasons, I think the decree of the surrogate should be further modified by overruling the objection to the referee's report in this particular, and the referee's report in that respect confirmed.

HOUGHTON, J., concurs.