1. EXECUTORS AND ADMINISTRATORS (§ 123*)—POSSESSION OF EXECUTORS—EFFECT.

While for some purposes a number of executors are regarded as one person and the possession of one is regarded as the possession of all, this rule does not apply to an executor who does not have actual possession of personal property belonging to his deceased, where the property, though in the possession of a coexecutor, is claimed by him individually.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 496–530; Dec. Dig. § 123.*]

2. EXECUTORS AND ADMINISTRATORS (§ 469*)—SURROGATES—POWERS.

A proceeding for the final accounting by an executor or administrator is one not under the probate powers of the surrogate, but is based on his statutory powers.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2000–2009, 2012, 2013; Dec. Dig. § 469.*]

3. EXECUTORS AND ADMINISTRATORS (§ 506*)—ACCOUNTING—BURDEN OF PROOF.

Where it is sought to surcharge executors with property not brought into the inventory or account, the burden of proof is upon the objectant, and if he fails to sustain this burden, the inventory or account will be approved.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2169–2177; Dec. Dig. § 506.*]

4. COURTS (§ 199*)—SURROGATE COURTS—STATUTES—CONSTRUCTION.

Statutes increasing the common-law jurisdiction of the surrogate should be strictly construed.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 470; Dec. Dig. § 199.*]

5. EXECUTORS AND ADMINISTRATORS (§ 469*)—SURROGATES—POWERS—AUTHORITY OF COURTS OF EQUITY.

Since the jurisdiction of the surrogate over administrative accountings by executors and administrators was increased, courts with general equity

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

jurisdiction do not exercise their similar powers over the accountings of executors or trustees, unless special cause for the interposition of equity is shown.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2000–2009, 2012, 2013; Dec. Dig. § 469.*]

6. EXECUTORS AND ADMINISTRATORS (§ 469*)—SURROGATES—JURISDICTION—ACCOUNTING BY EXECUTOR.

Unless conferred by Code Civ. Proc. § 2731, relating to administrative accountings by executors and administrators, the surrogate is without jurisdiction upon such accounting to determine controverted claims between the executors and others to property formerly owned by the testator.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2000–2009, 2012, 2013; Dec. Dig. § 469.*]

7. EXECUTORS AND ADMINISTRATORS (§ 465*)—STATUTES (§ 222*)—CONSTRUCTION OF STATUTE—ACCOUNTING BY EXECUTOR.

Common-law terms in a statute should be presumed to be used in their common-law sense, and hence the term "estate" used in Code Civ. Proc. § 2731, relating to contested accountings by executors, may be construed primarily as property in contradistinction to ownership, or that property which is personified in the interval between death and the grant of letters.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1990–1992; Dec. Dig. § 465;* Statutes, Cent. Dig. § 301; Dec. Dig. § 222.*

For other definitions, see Words and Phrases, vol. 3, pp. 2475–2488; vol. 8, pp. 7653, 7654.]

8. COURTS (§ 90*)—PRECEDENTS—STARE DECISIS.

The surrogate is not, under the rule of stare decisis, bound to follow decisions by a previous surrogate.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 313–321, 351; Dec. Dig. § 90.*]

9. EXECUTORS AND ADMINISTRATORS (§ 424*)—POWERS OF EXECUTOR.

An executor may bring an action against his coexecutor in equity for property belonging to the estate and claimed by the coexecutor individually.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1662; Dec. Dig. § 424.*]

10. WITNESSES (§ 175*)—COMPETENCY.

Notwithstanding Code Civ. Proc. § 829, disqualifying a survivor from testifying to a transaction where the other party is dead, an executor, in an action to recover property which once belonged to his testator and is now claimed by another as her own, may call the claimant to testify.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 711–713, 715, 720, 721, 915; Dec. Dig. § 175.*]

11. EXECUTORS AND ADMINISTRATORS (§ 507*)—ACCOUNTING—REPORT OF REFEREE.

Where the report of the referee to whom the matter of the final accounting of an executor was referred is insufficient to disclose the theory upon which he proceeded, it may be recommitted by the surrogate for further findings.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2004, 2005, 2178–2191; Dec. Dig. § 507.*]

12. EXECUTORS AND ADMINISTRATORS (§ 91*)—PROCEEDINGS FOR ADMINISTRATION.

After the death of a testator, executors have a reasonable time in which to break up his domestic establishment, and where the servants of the testator had been in his employ for a long time, it was not unreasonable

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for the executors to maintain the establishment and provide for the servants during a period of four months.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 397, 398, 400–402; Dec. Dig. § 91.*]

13. EXECUTORS AND ADMINISTRATORS (§ 109*)—RIGHTS OF EXECUTORS—ALLOWANCES.

Where part of a testator's property consisted of expensive furniture and a large residence, which had to be carefully cared for to be sold to advantage, the executor is entitled to credit for sums paid servants for the care of the property.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 435–438, 440–447, 763; Dec. Dig. § 109.*]

Judicial settlement of the account of Susan Matilda Watson, as executrix, and William H. Harris, as executor, of the will of Mary C. Hoffman, deceased. Account settled.

Paul R. Towne, of New York City, for executor.

Wing & Russell, of New York City (Paul R. Towne, of New York City, of counsel), for executrix.

Joline, Larkin & Rathbone, of New York City (Adrian H. Larkin and Albert Stickney, both of New York City, of counsel), for contestant Margaret H. Gallatin.

Bowers & Sands, of New York City, for contestant Hoffman Nickerson.

Warren Leslie, of New York City, special guardian.

FOWLER, S. This is a motion to confirm in part the report of a referee appointed by this court to take and state the accounts of the executors or, as it is phrased, to hear and determine all questions arising upon the settlement of the account. The present motion is to confirm the report and findings in part only and next to reject them in part. Counter objections and exceptions bringing up for review the validity of the balance of the findings and report have been duly taken in conformity with the practice in such cases made and provided. Thus the entire report and findings of the referee are now here for review on objections and exceptions.

Mrs. Hoffman, the testatrix, whose estate is involved in the accounting, as it appears, was the widow of the Very Reverend Dean Hoffman, in his lifetime an Episcopalian clergyman of this city. Mrs. Hoffman, in addition to her private means, received during her widowhood a large income derived from her husband's estate, so that her mode of life after his death continued on a more liberal scale than her own separate estate of itself justified. Mrs. Hoffman died seised of her residence in Gramercy Park, this city, and possessed in her own right of its valuable contents, and also inter alia of jewels accounted for at a valuation of $38,605. The account of the jewels does not, however, include a pearl necklace and a ruby ring of great value, which are now the subject of contention between the daughter and the granddaughter of testatrix. Whether the testatrix in fact died possessed of the necklace and the ruby ring is attempted to be put at issue in the proceeding to settle the account of Mrs. Hoffman's executors. It is

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

apparent that the necklace and the ruby ring were not inventoried or brought into the account by the executors because Mrs. Watson, the daughter of Mrs. Hoffman, and incidentally one of the executors under the will, was possessed of them under a claim of title.

[1-3] Mr. Harris, the other acting executor under the will of the late Mrs. Hoffman, and incidentally long the family adviser generally of Dean Hoffman's family, certainly never was possessed of the necklace or the ruby ring in question, nor is there any proof that he ever had any dominion or control of them. How Mr. Harris could be expected to bring them at this stage into his account under the circumstances disclosed it is difficult to perceive. Yet the referee has surcharged Mr. Harris as executor with these very valuable jewels. It is quite true in law that for some purposes a college of executors is regarded as one person (Bacon's Abr. Ex'rs D. 1), and in some instances the possession of one executor is in law the possession of all. But this is not, I think, such an instance. It should be remembered that a proceeding for a final or administrative accounting and distribution in this court is a resort to the jurisdiction conferred on the surrogates by statute. An accounting of this character is not an incident of the surrogates' probate jurisdiction. An accounting is in theory often an equitable suit, more or less elaborate, in which equitable considerations are controlling. There is a difference between an account and an inventory, exhibited in a court of this character and a statutory proceeding in such a court to settle the accounting and for distribution and administration of the assets of an estate. But I shall have occasion to refer to this distinction later.

If we assume, for the sake of argument only, that the surrogate has jurisdiction of this matter, it is well settled that where an inventory or schedule of an account of executors does not contain property alleged by the parties in interest cited to be a part of the estate of a testatrix, the burden of proof is very strongly on the objectants alleging the omission (Marre v. Ginochio, 2 Bradf. Sur. 165; Matter of Baker, 42 App. Div. 370, 59 N. Y. Supp. 121), as the inventory or account presumably contains all personal property for which the executors are chargeable (Matter of Mullon, 74 Hun, 358, 363, 26 N. Y. Supp. 683, reversed on another point, 145 N. Y. 98, 39 N. E. 821). I have always proceeded on this theory since coming into this court. The referee seems to have proceeded on the opposite theory, for such little evidence as there was before him disclosed that Mrs. Watson, the daughter of the testatrix, was possessed of the pearl necklace and the ruby ring under a claim of title by gifts before the death of the testatrix. As the objectants did not sustain the burden resting upon them, for this reason alone the referee's finding and report must be set aside for error in surcharging the executors with the necklace and the ruby ring.

[4-8] But there is another profounder question demanding our consideration. Has the surrogate jurisdiction to determine the better title to the pearl necklace and the ruby ring in the proceeding now here and under the circumstances clearly disclosed by the evidence? Of this I am not fully persuaded. The adjudications cited in support

of jurisdiction when subjected to critical analysis are, I fear, not so conclusive as to preclude the necessity of a further consideration of my jurisdiction in this proceeding, if it should become essential. Before examining that grave point let me give a summary, not in such detail as I should wish, of the sources of the various jurisdictions committed to the surrogates of this state, and incidentally the general legal and constitutional theory upon which the entire judicial establishment of this great state was founded and is continued in our own day.

The first Constitution of the state government (articles 25, 27, 35) and the "Act to further organize the government of the state" (chapter 12, Laws of 1778), contemplated the continuation of the common law and the judicial establishment existing in New York under the prior government. See Graham's Courts of Law and Equity in New York, and Streets' Council of Revision, passim. This was fully understood by those who erected and set on foot the state government, and who had lived under the former government. Whenever this fact has been lost sight of it has led to erroneous conceptions, sometimes to the prejudice of the rights of the citizens of the state. The new chancellor of the state was given in full the ordinary equity jurisdiction, but not the extraordinary jurisdiction of the chancellor known to the common law. The general courts of law were continued, with the jurisdictions of the King's Bench, Common Pleas, and Court of Exchequer vested in the former Supreme Court of New York. The lesser courts known to the common law were confirmed or re-established on the old basis, while the former jurisdiction of the Ecclesiastical Courts, in so far as exercised in New York before Independence and then recognized by the common law, was intended to be invested in the Court of Probate and its surrogates. Chapter 12, Laws of 1778; chapter 38, Laws of 1787; chapter 77, Laws of 1801. That this intention of the founders of the state government was subsequently executed in full in respect of the Probate Courts cannot be claimed, nor need the subtle social and political reasons why the original probate jurisdiction of the Probate Courts was at a later day more restricted by construction than should have been the case be now examined, as the discussion of that branch of the surrogates' jurisdiction is not precisely germane at the moment to the point under consideration. The probate or ordinary branch of the surrogates' jurisdiction is not now under review. It may be logically affirmed that some questions of their jurisdiction ought to have been resolved on entirely different lines from those other branches of the surrogates' jurisdiction conferred by later statutes. The trichotomy in the original plan of distributing known jurisdictions to the state courts dictated this distinction. But be this as it may, the original jurisdiction of the surrogates, however derived, was subsequently enlarged in many directions by various statutes of the state Legislature, and in respect of these enlargements, as is always the case when a known and historic jurisdiction is increased by statute, the statutes themselves have since been strictly construed. That rule of construction of late statutes affecting this court is beyond all controversy the settled law of this state. With this brief survey of the principles governing the construction of statutes conferring jurisdiction on sur-

rogates, we come now to the consideration of the jurisdiction of surrogates in final administrative accountings of executors or administrators.

That the Probate Courts had inherently a limited and concurrent jurisdiction, subsequently restated or enlarged by statutes of the state, over inventories and accounts of executors and administrators is undoubted (Coote, Ecc. Pr. 675; Swinburne, Wills, part VI, § 18, seq.; Proctor's Pr. in Ecc. Courts, 37; Telford v. Morrison, 2 Addams Ecc. 319; Greerside v. Benson, 3 Atk. 253; McKay v. Green, 3 John Ch. 56; Seymour v. Seymour, 4 John Ch. 410; Foster v. Wilber, 1 Paige, 537; Whitney v. Monro, 4 Edw. Ch. 5; Rogers v. King, 8 Paige, 210; Haddow v. Lundy, 59 N. Y. 320; Gerould v. Wilson, 81 N. Y. 579; Wager v. Wager, 89 N. Y. 168; Sanders v. Soutter, 126 N. Y. 193, 200, 27 N. E. 263), but the ordinary jurisdiction of such matters was in the Court of Chancery in England, and also in New York before the powers of that court were under the Constitution of 1846 merged in the Supreme Court of this state (2 Williams on Ex'rs, 1437, 1477; Gibbons v. Dawcey, 2 Ch. Cas. 198; Bissell v. Axtel, 2 Vern. 47; Story, Eq. Juris. c. IX; Foster v. Wilber, 1 Paige, 537, 542; Rogers v. King, 8 Paige, 210, 211; McKenzie v. L'Amoureux, 11 Barb. 516).

Since statutes of the state have enlarged the jurisdiction of the surrogates over administrative accountings the courts now possessed of general equity jurisdiction will not exercise their own jurisdiction in accountings of testamentary trustees or executors unless special cause for relief is made in the papers. Chipman v. Montgomery, 63 N. Y. 235, 236; Anderson v. Anderson, 112 N. Y. 115, 116, 19 N. E. 427, 2 L. R. A. 175; Sanders v. Soutter, 126 N. Y. 200, 27 N. E. 263. But this means that the equitable jurisdiction of the courts possessed of equitable powers is only displaced by such statutes affecting surrogates, and not that it is abrogated (3 Pomeroy Eq. Juris., note to section 1154, title "New York"), and where no relief can be granted by the surrogates the regular equitable forum is still open to suitors. Sanders v. Soutter, 126 N. Y. 200, 27 N. E. 263.

It is common knowledge that the jurisdiction of the surrogate on accountings formerly did not extend to the determination of controverted claims of executors or others to property formerly of the testator. Matter of Will of Walker, 136 N. Y. 20, 28, 29, 32 N. E. 633; Matter of Randall, 152 N. Y. 508, 46 N. E. 945. The general powers of a court of equity do not belong to a Surrogate's Court. Matter of Killan, O'Brien, J., 172 N. Y. 569, 65 N. E. 561, 63 L. R. A. 95; Sanders v. Soutter, 126 N. Y. 200, 27 N. E. 263; Matter of Thompson, 184 N. Y. 36, 76 N. E. 870; Matter of Schnabel, 202 N. Y. 134, 95 N. E. 698. If the surrogate now has such jurisdiction of the controversy over the necklace and ring, it is only by virtue of section 2731, Code of Civil Procedure, as at present enacted. Now the language of this section in so far as applicable is restricted:

"Where a contest arises between the accounting party and any of the other parties respecting property alleged to belong to the estate, but to which the accounting party lays claim, either individually or as representative of the

estate, * * * the contest must * * * be tried and determined * * * in the Surrogate's Court."

That this statute is·loosely and inartificially framed is most apparent. Prima facie it does not embrace this case. The accounting party before me does not claim property alleged to belong to an "estate." The accounting party here are Mr. Harris and Mrs. Watson combined as executors. Mr. Harris makes no claim and yet he is the accountant. The party claiming is Mrs. Watson individually and in her sole right and not as executrix. If the General Construction Law (chapter 27, Laws of 1909; Consol. Laws, c. 22) is here applicable, which I doubt, of course "the singular will include the plural and the plural number includes the singular."

But it is in any event only property "alleged to belong to the 'estate,' to which the accounting party lays claim," that can be the subject of controversy here under section 2731, C. C. P. If the property in question was not Mrs. Hoffman's when she died, can it be said to be property belonging to her "estate" within the section? The term "estate" in the statute is susceptible of a construction which narrows contests under this section to claims arising after the death of testatrix. The "estate" of a deceased person has a distinct technical sense at common law, and in construing statutes the use of the common-law sense of words is to be presumed. "Estate" may refer primarily to property, as contradistinguished from ownership, or to what the civilians called 'hereditas jacens,' or that property which is personified in the interval between death and the grant of letters. In Real Property Law "estate" is a derivative of status, e. g., a freehold is a status or "estate" that makes a freeholder. There is some discussion of the meaning of the term "estate" as used in chapter 18, C. C. P., in Matter of Alden, 75 Misc. Rep. 438, 135 N. Y. Supp. 511. I doubt in any event whether this statute was intended to confer on the Surrogates' Courts a jurisdiction to try the validity of all disputable transactions beween a deceased person and those subsequently his administrators, if such transactions were consummated and at an end before a testator concerned came to die. If so, what transactions and transactions how long anterior to the death of such party? Has the surrogate now jurisdiction under this section to review the validity of all the past business transactions of the testatrix with any person subsequently her executor if there may be any equitable or legal claim outstanding, or is there some temporal line which bounds such asserted jurisdiction? In such a well-ordered and ancient state as this these are not light questions, but grave questions affecting solid rights, and until the final court of review has passed on them they cannot, I think, be said to be settled definitively.

But I am told that the question on the statute is adjudicated. If so I must abide by it. But is it so? The cases cited to me are few. In Matter of Archer, 51 Misc. Rep. 260, 100 N. Y. Supp. 1095, the report is incomplete. Evidently the facts were different from those now here and the real principle was not much discussed at the bar. The judgment practically supported the validity of the assignment made by the testatrix to the sole accounting party before death of testatrix,·

and nothing further than that was necessary to the judgment. While my predecessor undoubtedly assumed in his own mind a jurisdiction in this court under section 2731, C. C. P., to determine the validity of such assignment, his opinion on the point of jurisdiction is only binding on me sub modo. In re Osborne, 1880, 13 Ch. D. 779, per Jessel, M. R.; Merry v. Nickalls, 1872, L. R., 7 Ch. 751; Finlay v. Darling, 1897, 1 Ch. 723. I think these adjudications last cited state well the principle of stare decisis which prevails in this state in so far as such principle relates to the conclusiveness of judgments of co-ordinate jurisdictions.

The decision in Sexton v. Sexton, 64 App. Div. 382, 72 N. Y. Supp. 213, affirmed 174 N. Y. 510, 66 N. E. 1116, concludes that section 2731, C. C. P., is a restatement of prior provisions contained in the Revised Statutes, 2 R. S. p. 95, § 71; 2 R. S. p. 220, § 1, subds. 3–6. If this is the true construction of section 2731, Sexton v. Sexton makes against the jurisdiction of the surrogate in the present instance, and, indeed, puts an end to the contention for jurisdiction. Matter of Cavanagh, 121 App. Div. 200, 105 N. Y. Supp. 850, is only an affirmation of the principle of Sexton v. Sexton, 64 App. Div. 385, 72 N. Y. Supp. 213. Besides, in Matter of Cavanagh the sole administratrix had brought the property into her accounts as administratrix, and thereafter, notwithstanding, laid inconsistent claim to it as a gift to her. In a measure she had asserted the jurisdiction of the surrogate, but the only point really decided by the court was an error in the ruling of the surrogate on matter of procedure. All the rest is obiter. In Matter of Niles, 142 App. Div. 198, 126 N. Y. Supp. 1066, the construction of section 2731, C. C. P., was not necessarily before the court, as the judgment turned wholly on other points. The principle of res adjudicata, therefore, has no application. The judgment of the surrogate in Matter of Munson, 70 Misc. Rep. 461, 128 N. Y. Supp. 1106, is too provisional to be regarded by me as a weighty precedent. These are the only authorities cited by counsel in support of the surrogate's jurisdiction in this proceeding to determine title to the necklace and ruby ring. No adjudication of the Court of Appeals is cited to me, and the question cannot be decided short of the Court of Appeals. The adjudications of the Court of Appeals, cited against the jurisdiction of the surrogate, are not precisely in point, but in principle they seem to me to make against the surrogate's jurisdiction in this proceeding to adjudicate on the validity of the testatrix's consummated gift inter vivos. Matter of Schnabel, 202 N. Y. 134, 95 N. E. 698. A distinct limitation of the surrogate's jurisdiction, under section 2731, C. C. P., was recognized by Surrogate Thomas himself in Matter of Finn, 44 Misc. Rep. 624, 90 N. Y. Supp. 159. But I need not now pass upon the question of the surrogate's jurisdiction in this matter, as it seems clear to me that the referee erred in surcharging Mr. Harris with the necklace and ruby ring for the reasons which I have given before in the course of this opinion. Even if I have jurisdiction the referee cannot, on the evidence, be sustained in respect of the title to the controverted jewels.

[9, 10] I may notice that the argument on the part of Mr. Harris, the executor of Mrs. Hoffman, is in error on one point. He argues that he has no right of action against Mrs. Watson for the jewels in her possession. But is this assertion accurate? An executor might always bring suit against his coexecutor in equity for property belonging to the estate. Peake v. Ledger, 8 Ha. 313; Earl Powlet v. Herbert, 1 Ves. Jr. 297; Franco v. Franco, 3 Ves. Jr. 75; Re Chertsey Market, 6 Pr. 279. And since the Code an action may be maintained in this state by one executor against his coexecutor in respect of property belonging to the estate, and the surrogate's decree on the accounting is no bar, when it appears that the property is not embraced in the account. Wurts v. Jenkins, 11 Barb. 546; Matter of Will of Walker, 136 N. Y. 29, 32 N. E. 633. Doubtless the surrogate may direct Mr. Harris to bring suit in the Supreme Court to recover the jewels in question in case the Surrogate's Court has no jurisdiction of the controversy. Meanwhile the accounting may be suspended until the issue is determined by judgment. In such an action the executor can, if he desires, call Mrs. Watson to the stand, notwithstanding section 829, C. C. P., and as she is a perfectly respectable person and the daughter of a well-known clergyman, there could be no presumption against her truthfulness under any circumstances. It is not conceivable that Mrs. Watson would tell an untruth about the jewels on the witness stand, and if Mr. Harris called her she would be made competent to testify.

I come now to the objections and exceptions to that part of the report and findings of the referee relating to the expenditures of the executors for maintenance of the residence of their testatrix, approximating $2,266.58. The referee does not favor me in detail with the precise legal theory upon which he allowed the various items of expenditure objected to; nor do the briefs of counsel discuss the legal principles really involved.

[11] I could doubtless send the report of the referee back for further findings and report (Matter of Schroeder, 113 App. Div. 213, 99 N. Y. Supp. 176), but I will not do so if I am able to come to any conclusion for myself on the evidence. The items objected to are generally, I think, of four kinds—wages of servants, their food and keep, the maintenance of the residence of testatrix, and sundry incidental disbursements. The executors had a testamentary power of sale of this residence, and the necessary expenditures incurred in executing the power are to be allowed them at some stage of their trust.

[12] It appears that when the testatrix came to die she had a number of servants in her employment. The contracts for such service, whatever they were, were her contracts, binding on her executors. The nature of these contracts does not appear. Whether in view of the long service of servants the executors of a person of means could be expected to turn them out of doors the moment the eyes of their mistress were forever closed I doubt. It certainly is not the custom among affluent families to turn servants of dead people summarily out of doors. The contracts for service included the proper maintenance and keep of such servants, and these obligations could not be

broken at the will of executors. This much is apparent to me. Whether under the circumstances disclosed the older servants were not also entitled to longer or shorter notice is also a question if the term of hiring was indefinite, as I think it may have been, although I find nothing in the evidence on this score. But in any event executors are entitled to a reasonable time for breaking up the domestic establishment of this particular testatrix and for discharging her servants. In England the Master of the Rolls considered two months not unreasonable delay on the part of executors, having regard to the position of the deceased and the circumstances of a particular case. Field v. Peckett, No. 3, 29 Beav. 576.

Mrs. Hoffman's executors seem to have kept all her servants on for four months at least, and during this time the executors supported and maintained such servants at a not unreasonable or extravagant rate. I am inclined to think that four months was not too long under the circumstances of this particular case. There are equitable expressions to be found in Matter of Schroeder, No. 1, 113 App. Div. 207, 99 N. Y. Supp. 176, which seem to justify indirectly the general conclusion I have reached.

[13] In May, 1912, the servants' pay roll was cut down very much by the executors, but the late residence of testatrix was still kept open under a smaller staff of servants. This is justified by the executors under the power of sale devised to them and the necessity they were under of preserving the expensive furniture and heirlooms in the residence and exhibiting the house in attractive form to intending purchasers. Executors are always allowed expenses incurred in protecting assets (Sharp v. Lush, 1879, 10 C. D. 468, per Jessel, M. R.; section 329, Woerner on American Law of Administration, and cases there cited). Where an executor is justified in employing servants to preserve the assets of testatrix, he will always be allowed payments made to them. Weiss v. Dill, 1834, 3 My. & K. 26. Such are some of the general principles applicable to this particular contention.

There are some items, no doubt, covered by the very general objections and exceptions which I should be inclined to allow did the state of the very vague evidence permit. I doubt, for instance, if a telephone in the vacated mansion was essential to upkeep, or the continued use of the electric lamps, as there seems to have been gaslight at hand and used at the same time. But I am not advised as to the plan of light distribution in this house or of the nature of the contracts between testatrix and the telephone company and the electric supply company. As the objection is general, and some of the items so objected to must be allowed, the objections and exceptions to the entire finding and report of the referee touching the upkeep and maintenance disbursements will be overruled, and the referee's report concerning the "maintenance items" approved. Settle decree accordingly.