(49 Misc. Rep. 371.)
### In re SANDROCK'S ESTATE.

(Surrogate's Court, Erie County. February, 1906.)

1. EXECUTORS AND ADMINISTRATORS—MISCONDUCT—DEALINGS WITH ESTATE.

An executor contracted to sell certain shares of stock. The executor owned some of the stock at the time of the contract, and purchased some of it afterwards from other persons. He also purchased from his coexecutors stock belonging to the estate, paying therefor the same price which he had paid to other persons for similar stock, which, however, was $100 a share less than he had contracted to sell it for. The sale was consummated under the contract which also provided that the executor should not engage in a certain business for a prescribed period of time. As payment for the stock obtained from the estate, the executor obtained the consent of his coexecutors to invest the funds of the estate in certain bonds and turned over to the estate a sufficient quantity of these bonds which were owned by him, to pay for the stock. *Held*, that the executor was chargeable with the amount which he received for stock purchased for the estate.

2. SAME—REMOVAL.

Where an executor having a contract to sell certain stock for $250 a share, purchased the same from the estate for $150 a share, retaining the balance, it was ground for removal.

3. WILLS—TESTAMENTARY TRUST—EXECUTION.

Where a will established a trust for the benefit of an incompetent son of testator, the deposit of bonds the par value of which equaled the amount of the trust fund but the market value of which was considerably below the par value, did not comply with the will.

Adelbert Moot and James C. Beecher, for Henry W. Burt, accounting executor.

Love & Keating, for Michael F. Fallon, objecting executor.

Louis L. Babcock, for Eunice Sandrock, beneficiary.

Samuel M. Welch, special guardian for Ralph Sandrock, incompetent.

HART, S. The will of Anastasia Sandrock designated three executors, William J. Sandrock, Henry W. Burt, and Michael F. Fallon. This will was duly admitted to probate in this court, May 23, 1904. All of the executors qualifying, letters testamentary were issued to them upon that day. A petition made by one of the executors, Michael F. Fallon, was filed May 11, 1905, alleging that the "active management of the estate had been almost exclusively under the control and direction of Henry W. Burt," and praying for an order appointing appraisers. Thereafter, and on the 17th day of May, 1905, the surrogate appointed two appraisers of the personal property of decedent. A conflict arose on the appraisal as to the proper valuation to be given to 178 shares of German American Bank stock, previously sold by Henry W. Burt, as executor, the property of the estate. Executor Fallon, at the same time, filed a petition with this court asking the removal of said Burt, on the ground that he had "fraudulently misappropriated and applied to his own use moneys and property of the estate." An answer was filed by Henry W. Burt, denying the allegations and accusations, also a

proposed account for final settlement in his behalf, including a petition in the alternative asking either his discharge, or the removal of Michael F. Fallon; Mr. Burt refusing further to serve with his coexecutor on account of discord and dissension. The evidence taken before me on the hearing discloses the fact that Henry W. Burt was the acting executor, and that the principal asset of the estate consisted of 178 shares of stock of the German American Bank, of which bank the executor, Henry W. Burt, was president.

During the "early part of 1904," inquiries were made by various persons, including a Mr. Appleyard, who "in the month of May, 1904," made a definite offer of $200 per share, if a controlling interest could be secured of the stock of the bank. This offer was brought to Mr. Burt's attention, in writing, with the request that he present it to the board of directors of the bank. Mr. Burt called a meeting of the board, and the directors in considering the offer passed a resolution May 13, 1904, which is entered on the Secretary's minute book of the bank, declaring it to "be the sense of the meeting that the value of the bank stock is $250 per share." It also appears from the testimony of William J. Sandrock, one of the executors, that Mr. Burt came to him, about this time, and stated that he might sell his own stock, and suggested the propriety of selling the Sandrock stock at the same time; that the price would be $150 per share, and that the estate would receive as much as he got. Mr. Burt did not disclose the fact to his coexecutor, W. J. Sandrock, that he had received an offer of $200 per share from Appleyard, at this or at any subsequent interview. Mr. Sandrock, however, assented to the sale at the "top price," believing it to be $150, having full confidence in Mr. Burt. There was some talk between them in which Mr. Burt swears that he told Mr. Sandrock that he expected to get a consideration for resigning from the bank, but that the Sandrock stock was to be sold for just what he got; that he did not mention the matter of "bonus" to Mr. Sandrock, as he did not think it was any of his business. Shortly after this time, and in the early part of June, Robert F. Schelling commenced negotiating with Mr. Burt for the purchase of control of the bank, resulting in a written agreement, executed by them on the 11th day of June, 1904, which reads as follows:

"This agreement made this 11th day of June, 1904, between Henry W. Burt, of the city of Buffalo, county of Erie and state of New York, party of the first part, and Robert F. Schelling, of the same place, party of the second part. Witnesseth: First. The party of the first part does hereby agree to sell, assign, and transfer to the party of the second part, four hundred and thirty-three (433) shares of the capital stock of the German American Bank, for the sum of one hundred and ten thousand ($110,000) dollars, to be paid in cash on or before July 15, 1904. If this sale is actually closed and consummated before July 1, 1904, the dividends payable July 1, 1904, shall belong to the second party, and if consummated after July 1, 1904, to the first party.

"Second. And the party of the second part hereby agrees to purchase said stock and to pay therefor the aforesaid price at the time herein before stated.

"Third. To insure the performance of this contract the party of the second part does hereby agree to deposit with the Seaboard National Bank of New York City, within five days after the execution of this contract, the sum of fifty thousand ($50,000) dollars as security for the performance of this contract on his part, and also agrees that on or before said 15th day of July, 1904, he

will pay the remainder of said one hundred and ten thousand dollars to said Seaboard National Bank.

"Fourth. The party of the first part agrees to deposit certificates for all said shares of stock, transferred in blank, within 10 days from the execution and delivery of this contract to the Seaboard National Bank.

"Fifth. The Seaboard National Bank is hereby requested to deliver the whole of said certificates of stock properly transferred to said Schelling immediately upon receiving the whole of said one hundred and ten thousand dollars.

"Sixth. The party of the first part agrees that he will not engage in the banking business for the period of two years within the city of Buffalo, or within a radius of twenty-five miles of Buffalo, directly or indirectly, and that for such period of two years, he will remain as director with the above German American Bank, or with the German Bank, and in all things perform his duties as such director for said period of two years.

"Seventh. It is expressly understood that said E. A. Weppner shall remain with said German American Bank or any consolidation thereof, for a period of at least two years, as its cashier. It is, however, expressly agreed that this contract shall be absolutely void and of no effect if on or before July 15, 1904, the party of the second part is unable to acquire in addition to the shares hereby intended to be purchased, at least five hundred and sixty-eight (568) shares of the capital stock of said German American Bank, at a price not to exceed $150 per share; the intention being that the party of the first part desires to acquire a majority of the stock of said German American Bank, and no less.

"Eighth. The party of the second part hereby agrees to use his best efforts to purchase said additional five hundred and sixty-eight (568) shares and to pay therefor no more than $150 per share, unless he, at his own option, desires to pay more therefor. And the first party does hereby agree to aid and assist in every manner the party of the second part to make such purchase to the end that this contract for the purchase of the aforesaid four hundred and thirty-three shares may be consummated.

"[Signed]                                  H. W. Burt.
                                      "Robert F. Schelling."

It appears, from the undisputed testimony of the various witnesses, that, immediately after the execution of this agreement, Robert F. Schelling purchased various blocks of stock of the bank, from different stockholders, at a price of about $150 per share. On the 17th day or June, 1904, William J. Sandrock, as coexecutor, indorsed over to Mr. Burt the 178 shares of stock, the property of the estate, which were also transferred on the stockbook of the bank. After securing the indorsement of the stock to himself, Mr. Burt and Mr. Schelling went to New York City together, and met by appointment at the Seaboard National Bank, June 20, 1904. At the request of Mr. Burt, Mr. Schelling divided the $110,000 payment as provided for in the agreement into three checks: No. 1, for $45,050; No. 2, for $26,700, and No. 3, for $38,250. Mr. Burt, after receiving these checks, indorsed them and deposited them to his individual account with the Seaboard National Bank, and applied them to the payment of his personal loan of $100,000 at this bank, thereby releasing collateral consisting of a series of International Traction bonds. Mr. Burt then took $35,000 of the bonds, par value, to Buffalo; he sent for Mr. Sandrock and told him he had made the sale of the bank stock at 150, and asked his opinion as to what it should be invested in and suggested the International Traction bonds, which was acquiesced in by Mr. Sandrock. Mr. Burt, shortly after this interview, sent for both of his coexecutors and told them of the sale of the stock and the investment in the bonds, not dis-

closing the fact that these bonds were his own property. A box was rented with a trust company and the bonds were deposited by the executors for safe-keeping. Mr. Burt, however, before depositing the bonds, removed therefrom the coupons for interest (2 per cent. semiannually) due July 1st, amounting to $700, and deposited his own check to the credit of the estate for $534, equivalent in amount to the semiannual dividend of 3 per cent. on 178 shares of the German American Bank stock, due also July 1st, which stock he had sold in New York to Mr. Schelling. Mr. Burt at no time consulted with his executors other than the conversations had with Mr. Sandrock. He never exhibited the contract sale to them or revealed its contents. It was not until the late winter of 1905 that Mr. Sandrock learned of the written agreement between Mr. Burt and Mr. Schelling.

Henry W. Burt as executor, in his account, Schedule A, charges himself with $26,700, as being the proceeds of the sale of 178 shares of bank stock, and it is the same stock comprised in the transaction which has been unfolded here in detail. It is the real item in dispute between the executors Michael F. Fallon and Henry W. Burt, the executor, Wiliam J. Sandrock, taking a neutral ground, refusing to engage in the controversy. The pleadings, affidavits and testimony have developed many extraneous matters not pertinent to the issue involved, but disclose an hostility that predicates but ill for the proper administration of the estate if allowed to continue. The animosity which may exist between Mr. Burt and Mr. Schelling is of no moment in arriving at my determination. The executor, Henry W. Burt, is a man advanced in years; he has held various positions of trust and responsibility, and has borne an excellent reputation. I will not attempt to characterize his motive in regard to the stock transaction; but will treat it entirely from its legal aspect. His able counsel has laid special stress upon the market value of the bank stock, and has shown in detail the sales to various people at the uniform price of about $150 per share. The sole question before me is, not what others received, but rather what price Mr. Burt received for the Sandrock stock. The written agreement of June 11th provides for the sale by Mr. Burt to Mr. Schelling of 433 shares of stock for $110,000, or $254.04 per share on its face. The 433 shares sold by Mr. Burt consisted of his own stock of 255 shares and the Sandrock estate stock of 178 shares. I am of the opinion that this must be treated as one incident. The terms of the contract were fulfilled, the stock was delivered and the money, $110,000, was paid to Mr. Burt. The mere fact of dividing the checks for payment cannot affect the character of the transaction. Mr. Burt, in explanation of the apparent discrepancy, declares that the check for $26,700 represents the proceeds of the 178 shares of the estate stock; $38,250 the sale of his own stock at $150 per share, and the third check for $45,050 he describes as a "personal bonus or consideration." His counsel refers to it as a consideration for his personal covenants.

The personal transaction and the trust sale were so closely commingled that it is impossible to separate one from the other. The explanation offered by Mr. Burt might be satisfactory, were it other than a mat-

ter of trusteeship. "The duties of a trustee to his beneficiary require not only the highest good faith in their execution, but also the absence of conflicting personal interests, and often the sacrifice of personal convenience and chance of profit." Trustees are held to great strictness in their dealings with the estate. Chancellor Kent enunciated the rule in the following terms:

"It may be here observed, as a general rule applicable to sales, that when a trustee of any description, or a person acting as an agent for others, sells a trust estate, and becomes himself interested, either directly or indirectly in the purchase, the cestui que trust is entitled, as of course, in his election to acquiesce in the sale. * * * A person cannot act as agent for another and become himself the buyer. He cannot be both buyer and seller at the same time, or connect his own interest in his dealings as an agent or trustee for another. It is incompatible with the fiduciary relation. The rule is founded on the danger of imposition, and the presumption of the existence of fraud, inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation, 'and which, in the cases in which such relationship exists, is deemed to be of itself sufficient to create the disqualification.'"

This doctrine has been followed by every text-book writer and the unanimity of decisions only emphasize the rule.

"Trustees hold a position of trust and confidence. The legal title of the trust property is in them and generally the whole management and control is in their hands. At the same time the beneficiaries of the trust may be women, or children, or persons incompetent to protect their own interests. For these reasons, to protect the weak and helpless on the one hand, and to prevent trustees from using their position and influence for their own gain, and to prevent them from hazarding the trust property upon what they may think to be profitable speculations, on the other hand, they are not allowed to make any profit from their office. They cannot use the trust property, nor their relation to it for their personal advantage. All the power and influence which the possession of the trust fund gives must be used for the benefit and advantage of the beneficial owners. No other rule would be safe; nor would it be possible for courts to apply any other rule as between trustee and cestui que trust. * * * Trustees cannot make a profit from the trust funds committed to them, by using the money in any kind of trade or speculation, nor in their own business; nor can they put the funds into the trade or business of another, under a stipulation that they shall receive a bonus or other profit or advantage." Perry Trusts, 427, 429. It is a well-established principle of equity that all profits arising from sales inure to the benefit of the cestui que trust. Fulton v. Whitney, 66 N. Y. 548.

I have carefully examined the evidence and scrutinized with care the contract of sale, and am unable to find any authority for the executor to extract a bonus from the contract price of $110,000 for 433 shares of stock, the joint property of the executor and the estate. He must therefore be charged with the actual proportion of the moneys received for 178 shares of stock on a basis of 433 shares sold for $110,000; and the application for his removal as executor is allowed, for the best interests of the beneficiaries and the proper administration of the estate. There is but one other matter before me at this time. A

trust of $10,000 was created under the will of Anastasia Sandrock for the benefit of an incompetent son, the income of which is to be applied for his care and maintenance and support. The deposit of $10,000, par value, of the bonds of the traction company at a market value of 77 was not a proper compliance as is properly urged by the special guardian.

A decree may be entered in accordance with the terms of this memorandum.

Decreed accordingly.