In the Matter of the Estate of EDWARD H. CLIFT, Deceased.*

Surrogate's Court, New York County, August 23, 1929.

*Taylor, Blanc, Capron & Marsh,* for the objectant.

*Henry N. Flynt,* special guardian.

*Goldsmith, Jackson & Brock* [*Joseph M. Hartfield, Osmond K. Fraenkel* and *Carlos L. Israels* of counsel], for the accountants.

*Frank Aranow,* referee.

*Louis Werner,* for the executors.

*White & Case,* for Goodrich estate.

* See, also, 135 Misc. 417.

O'BRIEN, S. Clift & Goodrich was an old and well-established partnership, conducting a business of commission merchants handling knit underwear and other knit goods. It was established by Clift, the decedent, in 1888. Its annual profits were very substantial. Clift died November 5, 1916. In his will, duly admitted to probate, he named as executors and trustees Edward I. Goodrich, his surviving partner, Martin E. Corbett, an employee of the firm (who later became a partner in the succeeding firm), and Louis Werner, the attorney for the firm and for the estate. Only Goodrich and Corbett qualified as executors and trustees.

In the partnership agreement, which was entered into June 1, 1908, between Clift and Goodrich, there was a provision which read as follows:

"*Tenth.* In the event of the decease of either of the parties hereto during either of the months of January, February or March, in any year of the existence of the copartnership, the partnership business shall be wound up and liquidated on the 1st day of January following such decease. In the event of the death of either of the parties hereto in any month other than January, February or March during the continuance of the copartnership, then the business is to be continued for the period of one year after the 1st day of January succeeding death."

In his will, which was executed January 28, 1916, there was a provision which reads as follows:

"*Twenty-third.* I do hereby authorize, empower and direct my said Executors and Trustees and such of them as shall qualify and act hereunder, the survivors, survivor and successor of them to loan at six per cent (6%) interest to any partnership of which said EDWARD I. GOODRICH and at least three of the present employees of the firm of Clift & Goodrich are members, or in case of the decease of the said EDWARD I. GOODRICH to any copartnership composed of MARTIN E. CORBETT, WILLIAM C. JONES and ADAM W. KLINE and such other employee or employees of the present firm of Clift & Goodrich as they may choose to associate with them the whole or any part of the funds held IN TRUST under this my last Will and Testament, so long as but not beyond the lives of the respective beneficiaries and provided a majority of the said Executors and Trustees, who shall qualify and act hereunder, shall in their discretion deem it advisable to make such loan or loans, and I direct that the investment of said trust funds by a loan thereof to the said partnership to be composed as aforesaid, shall entail no liability upon my said Executors and Trustees and shall be and deemed to be a proper investment for which they shall not be held responsible in case of loss or depreciation."

These respective excerpts from the copartnership agreement and the will of decedent are recited in the first instance for the reason that they play a vital part in the controversy which is now presented to the court in the form of exceptions which have been filed to the report of the referee, to whom was referred objections made to the accounting filed *January 19, 1928,* by Martin E. Corbett, as sole surviving executor of the estate, and by William J. McKee, Kate S. Goodrich, Thomas A. Sperry and Martin E. Corbett, as executors of the estate of Edward I. Goodrich, deceased, who, as stated above, was one of the executors and trustees of the Clift estate and *who died in December, 1926.*

The objections to the account were filed by decedent's son, Edward Read Clift, the residuary legatee under his will, and by Henry N. Flynt, special guardian for Paula Irene Clift and Doris Edna Clift. The main issue which was tried before the referee involved the failure of the surviving partner, Goodrich, to carry out the obligations of the agreement of copartnership to continue the business of the copartnership for the remainder of the year 1916 succeeding the death of Clift, and for the whole of the year 1917. The surviving partner, then one of the two executors and trustees under Clift's will, did not continue the copartnership business as prescribed in the agreement, but, on the other hand, immediately after decedent's death proceeded to organize a new firm which took over the business of the old partnership intact as a going concern on January 1, 1917. All the assets of the old firm were turned over to the new firm. The old employees, numbering about sixty, continued with the new firm, the firm's lease and office equipment were also taken over, a new set of books was opened and a book entry made transferring the amount of the Clift capital account on the books of the old firm, wherein he appeared as a partner, to the books of the new firm, wherein the estate appeared as a creditor.

As previously stated, the business of the old firm had become a very successful one. Their gross commissions generally amounted to more than half a million dollars a year, and the net annual profits between 1912 and 1916 were always over $115,000, and in 1913 and 1916 reached almost $169,000. The partnership agreement made no provision for the payment of any salary to either of the two partners, but each had a drawing account of $10,000 a year, and after taking out all expenses each partner was entitled to one-half of the net profits. The business conducted by Clift & Goodrich required the advancing of large sums of money to various manufacturing mills in order to enable them to proceed with the making of the goods for which the firm acted as sales

agent. About the time of Clift's death these loans from the banks varied from $500,000 to $900,000, and at the time of his death the amount owing to the banks was about $800,000.

It should be noted at the outset that the financing arranged by the firm was negotiated with three banks, the Chase National Bank, the Chemical National Bank and the National Bank of Commerce. The new partnership used the capital of the Clift estate, and in order to raise new and additional capital entered into an agreement with a mill owner, William Sloan, who had been a customer of said firm for many years, whereby Sloan loaned to the new firm the sum of $300,000 at six per cent interest. The old firm owed Sloan $225,000, and this loan was taken over by the new firm and Sloan paid an additional $75,000, thus producing the whole of his investment or loan to the firm of $300,000. The new firm throughout the year of 1917 produced net profits amounting to $290,557.82 without taking out partners' salaries. These profits were divided between the new partners as follows:

| | |
|---|---:|
| To Edward I. Goodrich, a salary of $50,000, plus fifty-one per cent of net profits (after deducting salaries), to wit, $97,184.49, making a total of. ........... | $147,184 49 |
| To Martin E. Corbett, a salary of $10,000 (his former salary had been $5,000), plus nine and three-quarters per cent of the net profits (after deducting salaries), to wit, $18,579.39, making a total of........... | 28,579 39 |
| To Adam Kline, a salary of $15,000, plus fourteen and three-quarters per cent of net profits (after deducting salaries), to wit, $28,107.28, making a total of.................................. | 43,107 28 |
| To William Jones, a salary of $15,000, plus fourteen and three-quarters per cent of net profits (after deducting salaries), to wit, $28,107.28, making a total of.................................. | 43,107 28 |
| To Thomas McKenzie, a salary of $10,000, plus nine and three-quarters per cent of the net profits (after deducting salaries), to wit, $18,579.39, making a total of.................................. | 28,579 39 |

In addition to these profits it should be noted that the new firm received moneys estimated at $161,247.56, representing commissions attributable to orders made in 1917, but actually collected in 1918, though a part of the gross business of 1917. While the new firm credited the estate with Clift's share of the commissions received during the year 1917 upon orders placed in 1916, no part of the moneys received in 1918 for orders placed in 1917 was turned

over to the Clift estate; nor, in fact, were any of the profits made by the new firm during the year 1917 credited to the estate. Here, then, lies the crux of the controversy that was threshed out before the referee and is now before this court.

It is contended by the objectants that the provision of the copartnership agreement entered into originally by Clift and Goodrich should have been carried out and the business continued until the end of 1917 and the estate credited with one-half of the net profits of the business for that period. The answer and defense of the surviving executor and trustee, Martin E. Corbett, who had been an employee of the old firm and who became a partner and salaried officer of the new firm, is that after Clift's death negotiations were taken up with the three banks named above, to determine what accommodations of credit the firm would be furnished by said banks, and that "the banks" took the position that they would not continue the same line of credit for the old firm as had been furnished by them during Clift's lifetime, and that thus Goodrich, the surviving partner, was compelled to effect an immediate liquidation and to establish at once a new partnership for the purpose of securing the necessary accommodations at the banks.

A secondary excuse or defense of the action taken by Goodrich as an executor and trustee on the one side, and sole surviving partner of decedent on the other, and Corbett, the employee of the firm on the one side, and executor and trustee on the other, is that one of the objectants, Edward Read Clift, who had been connected with the firm for some five years prior to his father's death, and who remained with the firm after his father's death, was aware of what was being done to liquidate the old firm and to establish a new firm, and that he acquiesced in what was being done. They also fall back on still another defense, to wit, an approval by him of an informal preliminary accounting made by the executors and trustees in 1922.

Right here it is appropriate to refer to the solemn, sacred and undeviating obligation resting upon an executor and trustee to protect at all hazards, even to his own personal loss or disadvantage, the estate under his administration where his personal and individual interests conflict with those of the estate and the persons interested therein. The principle involved is perhaps as widely known and as indelible an axiom as any in the whole domain of jurisprudence. Heaton expresses it clearly in his work on Surrogates' Courts ([4th ed.] at p. 1632):

"§ 334. Duty of trustees in dealing with trust property. The duties of a trustee to his beneficiary require not only the highest

good faith in their execution, but also the absence of conflicting personal interests, and often the sacrifice of personal convenience and chance of profit. Trustees are held to great strictness in their dealings with the estate. Chancellor KENT enunciated the rule in the following terms: ' It may be here observed, as a general rule applicable to sales, that when a trustee of any description, or a person acting as an agent for others, sells a trust estate, and becomes himself interested, either directly or indirectly in the purchase, the *cestui que trust* is entitled, as of course, to his election to acquiesce in the sale. \* \* \* A person cannot act as agent for another and become himself the buyer. He cannot be both buyer and seller at the same time, or connect his own interest in his dealings as an agent or trustee for another. It is incompatible with the fiduciary relation. The rule is founded on the danger of imposition, and the presumption of the existence of fraud, inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation, " and which, in the cases in which such relationship exists, is deemed to be of itself sufficient to create the disqualification." '

" This doctrine has been followed by every text-book writer and the unanimity of decisions only emphasizes the rule.

" Trustees hold a position of trust and confidence. The legal title of the trust property is in them and generally the whole management and control is in their hands. At the same time the beneficiaries of the trust may be women, or children, or persons incompetent to protect their own interests. For these reasons, to protect the weak and helpless on the one hand, and to prevent trustees from using their position and influence for their own gain, and to prevent them from hazarding the trust property upon what they may think to be profitable speculations, on the other hand, they are not allowed to make any profit from their office. They cannot use the trust property, nor their relation to it for their personal advantage. All the power and influence which the possession of the trust fund gives must be used for the benefit and advantage of the beneficial owners. No other rule would be safe; nor would it be possible for courts to apply any other rule as between trustee and *cestui que trust*. Trustees cannot make a profit from the trust funds committed to them, by using the money in any kind of trade or speculation, nor in their own business; nor can they put the funds into the trade or business of another, under a stipulation that they shall receive a bonus or other profit or advantage.

" It is a well-established principle of equity that all profits arising from sales inure to the benefit of the *cestui que trust*. *Fulton* v. *Whitney*, 66 N. Y. 548; *Matter of Sandrock*, 49 Misc. Rep. 371.

" A trustee cannot deal to his own advantage with matters connected with his trust estate; and any contract he may make to that end is invalid, *although no fraud be perpetrated* or duress practiced. *Carpenter* v. *Taylor*, 164 N. Y. 171; *Fulton* v. *Whitney*, 66 id. 548; *Matter of Schroeder*, *No. 1*, 113 App. Div. 204; 99 N. Y. Supp. 176; *Slater* v. *Slater*, 114 App. Div. 160; affd. 188 N. Y. 633."

In *Cowee* v. *Cornell* (75 N. Y. 91) the court said: " We return then to the question whether this case was one of constructive fraud. It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party asking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled." (See, also, *Ten Eyck* v. *Whitbeck*, 156 N. Y. 341; *Matter of Booth*, 215 App. Div. 516; *Allen* v. *La Vaud*, 213 N. Y. 322; *Bronx County Trust Co.* v. *O'Connor*, 220 App. Div. 340.)

From all of the above authorities we can see clearly the nature of the obligation placed upon Corbett, the surviving trustee, to justify the failure of himself and Goodrich to continue the business for the term specified by the copartnership agreement and to turn over one-half of the net profits of such continued business to the Clift estate. After close analysis of the testimony and the exhibits and a perusal of the trustees' brief, it is my firm conclusion that neither Goodrich nor Corbett ever appreciated that peculiar obligation placed upon executors and trustees who have personal interests conflicting with their official obligations. As it stands, they have failed utterly to sustain the burden cast upon them to explain and to justify the immediate liquidation of the old firm and the hurried establishment of a new firm, which for the year 1917 received huge profits, as above set forth.

1. An analysis of the proofs submitted by Corbett and the representatives of the deceased executor and trustee, Goodrich, lays bare the weakness of their defense and justification. The concrete questions presented upon the trial were: Did the best interests of the estate (not the interests of the surviving partner,

Goodrich) make imperative the immediate liquidation of the old firm and the establishment of a new firm? And this proposition involves the question: Was it possible to continue the business of Clift & Goodrich until January 1, 1918, in accordance with the provisions of the 10th paragraph of the copartnership agreement? Upon these points there were presented in behalf of Corbett and the deceased trustee the testimony of (1) Corbett himself; (2) Werner, now deceased, who was the attorney for the firm and for the estate; (3) Howell, who was the vice-president of the National Bank of Commerce; (4) Sloan, the mill owner, who had been loaning money to the old firm and who also loaned to the new firm $300,000, and (5) certain exhibits, the principal of which were Exhibits Nos. 1, 4 and 5. Speaking generally of these proofs, with the exception of the testimony of Attorney Werner and the statements which Corbett and Sloan put in the mouth of Goodrich, now deceased, nowhere can there be found any support for the claim now made by Corbett that the banks, after the death of Clift, refused any further accommodations to Clift & Goodrich. On the contrary, said exhibits support the conclusion that the plan to liquidate the old firm and organize the new firm was determined upon immediately upon Clift's death, and further, that there was no refusal upon the part of either of the three banks to accommodate financially the firm of Clift & Goodrich. Referring particularly to the testimony of Corbett, it has no probative force upon the question whether the banks refused further accommodations. His testimony almost entirely consisted of statements which he says Goodrich made to him. There is an entire lack of anything like first-hand knowledge upon the part of Corbett. Practically he left everything to Goodrich, although he himself was an executor and trustee. Thus (p. 267), in answer to the question, "Mr. Corbett, when you testified the last time did you mean to convey the impression that Clift & Goodrich, the old firm, could not borrow money from any of the three banks, namely, Chemical National Bank, National Bank of Commerce and the Chase National Bank?" Corbett replied: "That is what I understood from Mr. Goodrich." Mr. H. P. Howell, who was vice-president of the National Bank of Commerce at the time of Clift's death, was called to the witness stand by the executors, and nowhere in his testimony does he declare that he told Goodrich or Werner that his bank would not furnish any further accommodations to the old firm, though a strong effort was made to elicit a statement from him on this point. When all of the proofs offered by the executors and trustees upon this proposition are analyzed, the testimony of Attorney Werner, relying upon his memory as to

occurrences of twelve years before, is the only affirmative proof directly upon the proposition of the banks' refusal. Werner, in a definite, flat-footed fashion, declared on the witness stand that the banks made such a refusal. He said (p. 7): " A few days after Mr. Clift's death I saw Mr. Howell of the Bank of Commerce — I think he was Vice President at the time — and also saw Mr. Martindale, who was President of the Chemical National Bank at that time. They *substantially* told me that they could not give further accommodation to Clift & Goodrich by way of discounts or loans unless the capital which Mr. Clift had in the business was replaced by substantially an equivalent amount of capital. They also told me that they had conferred with their attorneys and the attorneys had advised them that Mr. Clift's investment in the business became a liability, and, therefore, not alone was the capital of the partnership reduced so far as creditors are concerned and particularly the banks, but that the liabilities had increased by reason of Mr. Clift's death. They suggested that unless new capital either put into the business by a general partner or a special partner could be secured, all accommodations on the part of the banks would have to stop. * * * " How far the lapse of time may have in Mr. Werner's memory confused statements made by Goodrich with information received by Werner directly from the officers of the banks it is difficult to say. *In any event, Werner's statement about the attitude of the banks is borne out neither by (1) the testimony of Mr. Howell, nor (2) the long opinion rendered to the National Bank of Commerce by its attorney, John Quinn (Exhibit 4), nor (3) by the credit files of the banks which according to the practices of each of said institutions contain memoranda setting forth salient points in conversations of the officers with customers of the banks.* It is a fair assumption, having in mind the custom followed by these institutions, that if the officers in their interviews with either Werner or Goodrich refused further accommodations, a memorandum to that effect would have been placed in the credit files. It is a significant fact that Goodrich (Exhibit 3) in his letter dated November ninth to Mr. Howell wrote: " Our attorney states in his opinion there is no reason why the present concern of Clift & Goodrich cannot borrow money. We should like to know what your attorney thinks of same." Moreover, Quinn in his advice to Howell's bank, *dated November thirteenth*, states, among other things: " *You understand that Clift's will, of which you have not yet received a copy, provides that Clift's interest in the copartnership shall be closed out forthwith and the amount due his estate be allowed to remain with the copartnership for a term of years as a loan. Sloan has agreed to become a special partner with an investment equal to*

*the amount of capital withdrawn by the Clift estate.*" Thus it would appear (a) *that neither Goodrich nor Werner had turned over a copy of Clift's will to the bank;* (b) *that someone, presumably Goodrich or Werner, had erroneously stated to Mr. Howell that under Clift's will Clift's interest in the copartnership must be closed out forthwith,* and (c) *that even at that early date, November 13, 1916, they had secured Sloan as a special partner with an investment equal to the amount of capital withdrawn by the Clift estate.* Quinn's letter in another paragraph negatives the testimony that the banks refused further accommodations, for while he (Exhibit 4) advised Vice-President Howell that " the surviving partner of Clift & Goodrich has no authority to bind the copartnership assets for new obligations after the dissolution of the firm. Such note would bind merely Goodrich," he advises further on as follows: "*It is as you know not unusual for personal representatives, such as executors, administrators or trustees of a deceased partner in cases like this, where the representative of the deceased partner is going to leave the partner's interest in the business, to indorse or make themselves liable with the surviving partner pending the actual contribution of the funds to the business or the constitution of the new partnership. This would be asking nothing of the Clift estate, for as it is today the Clift estate is liable for this partnership obligation and not only liable but liable for the full amount if Goodrich should turn out to be insolvent. So much for the law of the questions submitted by you. As to the business questions I am of the opinion that the bank should either adopt that course and get the Clift estate to indorse the obligation, or see to it before it renews any of the old firm's obligations, that the partnership affairs are closed out and the amount due Clift loaned to the firm for a term of years.*" Right here it should be recorded that as a matter of fact, between the death of Clift and January 1, 1917, the banks actually discounted $500,000 of notes for the old firm.

After analyzing the testimony and the exhibits, the conclusions are inevitable: (1) That the banks did not refuse accommodations which would have enabled the continuing of the business in accordance with the 10th paragraph of the copartnership agreement; (2) that the trustees did not make a sincere effort to carry along the business, but that (3) immediately upon Clift's death they determined to form a new firm to eliminate the Clift estate as a partner and to make the estate a creditor.

If any further argument be necessary to establish the failure of the executors and trustees to meet the requirements of the fiduciary position which they held, it is available in their failure to take advantage of sections 213 and 215 of the Surrogate's Court Act, and before taking such definite and far-reaching step as the

setting up of a new firm, to present the whole situation to this court and secure its advice and direction.

2. The executors have made an effort to bolster up their weak position with reference to the hurried liquidation of the old firm by claiming that the objectant, Edward Read Clift, decedent's son, knew of what they were doing, knew that the banks refused further accommodations, and was aware of the organization of the new firm. Werner in his testimony stated that he discussed these matters with the son after his father's death. Edward Read Clift contradicts Werner in this respect. He testified that Werner never discussed with him the matter of the liquidation of the firm of Clift & Goodrich. But it is not necessary for the purpose of the questions before us to attempt to reconcile the testimony of Edward Read Clift and Attorney Werner. *The former testified that he never knew of the written agreement of copartnership until the spring of 1928.* I believe his testimony. It is a significant fact that nowhere in the testimony of Werner or of Corbett is there a statement that either of them or Goodrich ever disclosed to decedent's son the partnership agreement. Nowhere in the record is any attempt made to explain, excuse or justify the executors' failure to show the copartnership agreement to decedent's son who was so vitally interested in that instrument. Their withholding from him of that agreement and their hurried hatching of the plans to organize a new firm immediately upon the death of Clift and while his son was confined to his home with influenza, are sufficient in themselves to establish the bad faith of the executors. The son's whole attitude throughout confirms the statement that he did not know of the copartnership agreement until the spring of 1928. But assuming for the purpose of argument that he did know in a general way that liquidation was going on, the executors cannot absolve themselves from the penalties they have incurred by not living up to the terms of the copartnership agreement, for Goodrich and Corbett as individuals, with personal individual interests dealing with Goodrich and Corbett, executors and trustees, knew of the provisions of the contract of copartnership with its arrangement for the continuation of the business and its division of the profits, and yet immediately upon the death of Clift they proceeded with negotiations to eliminate the Clift estate as a partner entitled to half of the profits for a period of more than fourteen months and substitute the Clift estate as an investor in the new firm with only six per cent return upon the amount invested. They may not shield themselves behind the provision contained in paragraph 23 of Clift's will, for the only construction which they should have placed upon said paragraph consistent with their obligations to the estate was that said para-

graph was not intended to abrogate the provision in the contract of copartnership that required a continuation of the business, but rather that the investment of the estate trust funds in a new firm was to be made after the business of Clift & Goodrich was liquidated in the manner prescribed by the copartnership agreement and when the trusts were about to be set up. Again, it must be borne in mind that Edward Read Clift was not the only party in interest in his father's estate; there were possible remaindermen, there were minors, there were children as yet unborn whose interests are protected by the rigid rule governing the acts and conduct of executors and trustees whose personal interests are brought in conflict with their official obligations.

3. A third and equally weak defense is set up by the executors in their Exhibit 1, a document which purports to be an accounting of the executors and trustees and to which, under a statement of approval of the accounts and schedules written by Attorney Werner, Edward Read Clift on October 18, 1922, signed his name. The drawing up of an informal accounting (six years after decedent's death) and the securing of the signature of the trusting, believing legatee cast strong suspicion over the whole administration of this estate, for the question naturally arises: Why did the executors not account in the legal, formal, customary way and thus not only put all parties in interest, including Edward Reed Clift, on their inquiry, but also provide for the proper, timely and vigilant protection of the minors interested in this estate? Why did the attorney have Edward Read Clift brought from Chicago at that time and in a conference present to him an accounting, read off the items and ask him to sign it under an approval which he, the attorney, wrote out in long hand on the face of the first page. The very fact that Edward Read Clift without demurrer, without questioning and without guile, signed this paper shows that he needs and ought to have the protection of this court.

4. Goodrich and his new firm made no allowance to the estate for the good will of the firm of Clift & Goodrich. An allowance for said good will should have been made. At the very least, the executors should have presented the question as to whether or not there was under the circumstances a " good will " of any value, to the Surrogate's Court.

5. The exceptions to the referee's report, Nos. 2, 8 and 10 of the special guardian, are sustained; otherwise his exceptions are overruled. The exceptions of Edward Read Clift are sustained so far as outlined in the foregoing opinion; otherwise they are overruled. Submit decree accordingly.